UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LINDA HARDIN,                          )
                                       )
            Plaintiff,                 )
                                       )
      vs.                              )        No. 4:08-CV-416 (CEJ)
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social                 )
Security,                              )
                                       )
            Defendant.                 )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social
Security Administration.

## I. Procedural History

On February 9, 2006, plaintiff filed an application for disability insurance benefits
under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., §§ 1381 et seq., and
an application for supplemental security income disability benefits under Title XVI of
the Act, 42 U.S.C. §§ 1391 et seq. (Tr. 89, 93). Plaintiff claimed disability due to
asthma and problems with her right arm and shoulder. (Tr. 133). Plaintiff alleges that
her disability began on October 1, 2003. (Tr. 133). The applications were initially
denied. (Tr. 64-68). Plaintiff requested a hearing, which was held before an
Administrative Law Judge (ALJ) on July 11, 2007. (Tr. 36-61). Plaintiff testified in
response to questions posed by the ALJ and by plaintiff's counsel. (Tr. 36-55). The
ALJ also heard testimony from Brenda Young, a vocational expert. (Tr. 55-60).

On August 7, 2007, the ALJ found that plaintiff was not disabled and denied her
claims for benefits. (Tr. 24-33). Plaintiff requested review of the ALJ's decision by the
Appeals Council. (Tr. 16). On February 1, 2008, the Appeals Council denied plaintiff's

request. (Tr. 2). Therefore, the ALJ's determination denying plaintiff benefits stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

At the time of the hearing, plaintiff was forty-five years old and lived with her three children, aged twelve, three and two years old. (Tr. 40, 51, 93). Plaintiff suffered from gestational diabetes during her pregnancies, all of which ended by Caesarean delivery. (Tr. 40). Plaintiff testified that the diabetes had resolved following the birth of her children. (Tr. 41).

Plaintiff testified that she graduated from high school and had previous work experience as a factory worker doing assembly line work. (Tr. 39). Plaintiff worked in the factory for nearly nine years. (Tr. 39). Her duties included putting together different products as they moved through the assembly line. (Tr. 134). She had worked in a shoe factory, a metal parts factory and a sports equipment factory. (Tr. 134). During her employment at these factories, plaintiff would frequently have to lift fifteen pounds and occasionally lift up to thirty pounds. (Tr. 134-35). She was required to stand for seven hours of each work day. (Tr. 134). Her past work also included working as a cashier at a convenience store and in the deli department of a grocery store. (Tr. 134). Plaintiff had not worked since October 1, 2003, the date she alleges her disability began. (Tr. 133). She claimed that she could not work because of asthma and problems with her right arm and shoulder which limit her ability to walk very far before feeling overly exerted. (Tr. 133).

Plaintiff begins a typical day by cooking breakfast for her children and taking her oldest child to school. (Tr. 124). She returns home to care for her two younger children. (Tr. 124). She is capable of doing some household chores, including laundry, and washing dishes. (Tr. 124). She can prepare and cook her own meals,

and will typically prepare lunch for her young children. (Tr. 124). Plaintiff is able to drive without difficulty and is able to do her own grocery shopping. (Tr. 126). She goes shopping once or twice a week for four to five hours each time. (Tr. 127).

Plaintiff enjoys horse back riding and painting. (Tr. 128). She claims that she cannot perform these hobbies as frequently as she would like, because she cannot inhale paint and is unable to walk far distances. (Tr. 128). She claims that she can walk twenty to twenty-five feet without rest, and must rest for approximately fifteen minutes before walking again. (Tr. 129). She also claims difficulty with lifting, squatting, bending, reaching, walking and climbing stairs. (Tr. 129).

The ALJ also heard testimony from Brenda Young, a vocational expert. Ms. Young testified that plaintiff was precluded from her past factory work due to the exposure to humidity and fumes. (Tr. 56). Ms. Young opined that plaintiff could perform light work as a cashier or light assembly work. (Tr. 56-57).

### III. Medical Records

On November 11, 2002, plaintiff saw Thomas J. Mitchell, M.D. with complaints of a cough and wheezing. (Tr. 175). Plaintiff stated that she had used an inhaler in the past but was not using one at that time. (Tr. 175). She reported "no other illnesses." (Tr. 175).

Her cough and wheezing continued during her visit on November 21, 2002. (Tr. 175). It was believed that plaintiff was suffering from allergies. (Tr. 175). On December 13, 2002, plaintiff reported that her symptoms had gotten worse since she'd been off of medicine. (Tr. 175). Her diagnosis was asthma. (Tr. 175). On December 20, 2002, plaintiff saw Dr. Mitchell with complaints of a cough and chest pain. The diagnosis was sinusitis.

−3−

On January 18, 2003, plaintiff went to emergency room at St. John's Mercy Hospital with complaints of fever, headache, cough with yellow sputum, and lower abdominal and low back pain. (Tr. 363). Treatment notes indicate that plaintiff suffered from increased shortness of breath secondary to her history of asthma. (Tr. 363). It was noted that plaintiff had been financially unable to treat her asthma with medication. (Tr. 363). Upon examination, Plaintiff appeared to have a decreased level of energy due to her asthma. (Tr. 363). She was wheezing throughout the exam. (Tr. 363). Significant tenderness was noted on the right side of her abdomen. (Tr. 363). A chest x-ray showed that the lungs were clear of infiltrate. (Tr. 370). The clinical impression was that there was "no active disease" in the lungs. (Tr. 370). Plaintiff was diagnosed with urinary tract infection, asthma exacerbation and sinusitis. (Tr. 364). Plaintiff was given Albuterol[1] and an antibiotic. (Tr. 364). She was discharged and told to follow up with Dr. Mitchell in one week. (Tr. 366).

Treatment notes from Dr. Mitchell indicate that plaintiff was provided samples of Advair[2] and Singulair[3] on January 20 and January 31, 2003. (Tr. 175). Dr. Mitchell gave plaintiff additional samples on March 7, 2003. (Tr. 175). The record is devoid of any other medical notes indicating any treatment of plaintiff by Dr. Mitchell during this time period. (Tr. 175).

---

[1]Albuterol is an aerosol inhalant prescribed for treatment of bronchospasm. See Phys. Desk Ref. 3067 (60th ed. 2006).

[2]Advair Diskus is a combination of asthma medication containing fluticasone and salmeterol. Meriam-Webster's Online Medical Dictionary, at http://meriam-webster.com/medical/advair (last viewed February 15, 2010).

[3]Singulair is indicated for the prophylactic and chronic treatment of asthma and for relief of symptoms of allergic rhinitis. See Phys. Desk Ref. 2080 (61st ed. 2007).

Plaintiff went to the emergency room on April 17, 2003, with congestion and difficulty breathing. (Tr. 354). She stated that she had been having a lot of trouble with her asthma. (Tr. 354). She did not believe that her medication had been working to control her symptoms. (Tr. 354). Plaintiff denied chest pains. (Tr. 354). Upon examination, it was noted that plaintiff's breathing was not labored. (Tr. 354). A chest x-ray showed no changes. (Tr. 355). Upon treatment, plaintiff stopped wheezing and she felt dramatic improvement. (Tr. 355). Plaintiff's diagnosis was mild reactive airway disease with bronchitis and mild peripheral edema. (Tr. 355).

The next day, on April 18, plaintiff went to Dr. Mitchell's office with complaints of a cold, wheezing and pain in her ear. (Tr. 174). Plaintiff's diagnosis remained asthma and sinusitis. (Tr. 174). Plaintiff did not see Dr. Mitchell again until July 11, 2003, when she complained of headaches around her eyes. (Tr. 174). Dr. Mitchell believed that plaintiff was suffering from "depression bipolar." (Tr. 174). She was prescribed Prozac.[4] (Tr. 174). On July 25, plaintiff's Prozac dosage was increased. Her diagnoses at that time were asthma and depression. (Tr. 174).

Plaintiff did not visit Dr. Mitchell again until September 25, 2003. (Tr. 173-74). She noted that she had experienced difficulty sleeping, although medication helped her sleep better. (Tr. 173). Sleep problems were also noted in treatment notes dated November 18, 2003. (Tr. 173).

Plaintiff went to the emergency room at Missouri Baptist Hospital on October 17, 2003, reporting that she had hurt her right shoulder at work and was experiencing pain. (Tr. 499). Her pain was self-described as 10 out of 10. (Tr. 501). Test results

---

[4]Prozac is a psychotropic drug indicated for treatment of, *inter alia*, major depressive disorder. See Phys. Desk. Ref. 1772-72 (60th ed. 2006).

shows no fracture.  (Tr. 504).  Plaintiff was diagnosed with a deltoid muscle strain.  (Tr. 499).

The next day, plaintiff went to the emergency room at St. John's Mercy Hospital.  (Tr. 347).  Plaintiff complained that her right shoulder pain was getting worse.  (Tr. 347).  Examination revealed no obvious redness or swelling to the right shoulder.  (Tr. 347).  Plaintiff's range of motion was limited beyond 90 degrees.  (Tr. 347).

On October 27, 2003, treatment notes indicate that plaintiff underwent a physical therapy evaluation for her right shoulder.  (Tr. 342).  Plaintiff reported that she was experiencing constant throbbing pain, even at rest.  (Tr. 342).  Plaintiff's range of motion was limited.  (Tr. 342).  Her right arm strength was unable to be fully assessed due to her pain.  (Tr. 342).  It was believed that plaintiff would benefit from a physical therapy program.  (Tr. 343).

Physical therapy notes from October 29, 2003, indicate that plaintiff's pain was reported as 9 to 10 out of 10.  (Tr. 340).  Plaintiff stated that she was not sleeping well.  (Tr. 340).  Her diagnosis remained a right shoulder sprain or strain.  (Tr. 340).  Plaintiff's pain was described as 8 out of 10 on October 31, 2003 and again on November 3, 2003.  (Tr. 340).

Plaintiff presented again for physical therapy on November 7, 2003.  (Tr. 341).  She reported that she was pregnant and could no longer take pain medication.  (Tr. 341).  She described her pain as 10 out of 10.  (Tr. 341).  Swelling was observed on plaintiff's right arm, which was tender to the touch.  (Tr. 341).  Plaintiff was wearing a sling and exhibited a limited range of motion.  (Tr. 341).

On April 9, 2004, plaintiff saw Dr. Mitchell with complaints of asthma.  (Tr. 173).  She reported that her asthma symptoms had gotten worse since she became pregnant.  (Tr. 173).  Her OB-GYN physician, Dr. Korba, had told plaintiff that she

–6–

could not take Advair while pregnant. (Tr. 173). Plaintiff's medication options included Albuterol or Singulair, which was not covered by her insurance. (Tr. 173). Plaintiff was prescribed Singulair with a nebulizer. (Tr. 173). On April 15, 2004, plaintiff reported that her asthma had improved with the nebulizer. Plaintiff's diagnoses were asthma, pregnancy and sinusitis. (Tr. 173).

Plaintiff saw Dr. Korba on April 19, 2004, when she was seven months pregnant.[5] (Tr. 333). She was wheezing while breathing. (Tr. 334). Dr. Korba noted that plaintiff did not have an asthma inhaler with her. (Tr. 334). Dr. Korba ordered breathing treatments for plaintiff. (Tr. 334). Plaintiff was feeling better after the treatments. (Tr. 334).

On May 5, 2004, on the advice of Dr. Korba, plaintiff went to the emergency room at St. John's Mercy Hospital with difficulty breathing. (Tr. 316). Plaintiff had been at a prenatal visit with Dr. Korba earlier in the day when she was noted to be wheezing. (Tr. 316). Plaintiff was taking prenatal vitamins, Singulair and Albuterol. (Tr. 316). Plaintiff denied recurrent shortness of breath or cough. (Tr. 316). Although wheezing was noted, examination revealed that plaintiff's lungs were moving air "fairly well." (Tr. 317). Plaintiff's diagnoses were reactive airway disease with pregnancy and bronchitis. (Tr. 317). Plaintiff was treated with medication and showed "good improvement of symptoms." (Tr. 317). Plaintiff was no longer wheezing at discharge. (Tr. 317).

Plaintiff gave birth to her daughter on June 25, 2004. (Tr. 215). While hospitalized, plaintiff was referred to respiratory care services for evaluation of her breathing. (Tr. 251). Low pitched wheezing was present. (Tr. 252). Plaintiff was

---

[5]Treatment notes from plaintiff's prenatal appointments with Dr. Korba will be discussed only if they contain information relating to the alleged disabilities of plaintiff.

directed to continue taking her asthma medication. (Tr. 251-52). Plaintiff was discharged on June 28, 2004. (Tr. 230). Her asthma was noted to be "improved." (Tr. 230). Discharge notes indicate that plaintiff's "pregnancy was complicated by exacerbation of her asthma symptoms, which have since resolved with medication." (Tr. 215).

On July 11, 2004, plaintiff presented to the emergency room with complaints of an infection of her Caesarean incision. (Tr. 208). Plaintiff appeared healthy. (Tr. 209). Other than bleeding from the incision, plaintiff had no other complaints. (Tr. 209). Examination revealed that her lungs were "clear throughout" and "normal." (Tr. 210).

Plaintiff saw Dr. Mitchell on July 16, 2004, with complaints of pain in her left ear and jaw. (Tr. 172). Treatment notes do not indicate any complaint regarding breathing and asthma was not noted as a diagnosis. (Tr. 172). On July 26, 2004, plaintiff reported that her pain was better although she had a sore throat. (Tr. 172). Asthma was not listed as one of plaintiff's diagnoses. (Tr. 172).

The next treatment notes in the record do not appear until April 30, 2005, when plaintiff was pregnant again and saw Dr. Korba for an examination. (Tr. 202). Plaintiff delivered her third child on May 27, 2005. (Tr. 177). Treatment notes during this time period fail to mention any significant complaints of asthma or right shoulder pain.

On August 28, 2005, plaintiff presented to the emergency room with complaints of a migraine headache and sinus pressure. (Tr. 492). Other than some wheezing, respiratory issues were not listed as a concern. (Tr. 492-93). Plaintiff's diagnosis was sinusitis. (Tr. 497).

Plaintiff was examined by Arthur P. Greenberg, M.D., on October 12, 2005. (Tr. 383). Plaintiff appeared "comfortable in both the supine and sitting position." (Tr.

384).  Plaintiff had audible breathing with minimal exertion and audible wheezing.  (Tr.

384).  Plaintiff exhibited a full range of motion in her arms and examination did not

reveal tenderness.  (Tr. 385).  Dr. Greenberg noted that plaintiff suffered a rotator cuff

tear in 2004.  (Tr. 383).  Dr. Greenberg diagnosed plaintiff with asthma "with labored

breathing, wheezing and dyspnea on very mild exertion."  (Tr. 386).

On December 6, 2005, plaintiff visited the emergency room with complaints of

chest pain.  (Tr. 415).  Plaintiff stated that the pain intensified during breathing.  (Tr.

415).  The severity of plaintiff's pain was noted as "mild."  (Tr. 406).  Plaintiff exhibited

audible wheezing.  (Tr. 415).  She admitted that she had not been using an inhaler or

other medication for her asthma.  (Tr. 406).  An x-ray of plaintiff's chest showed the

lungs to be clear of focal infiltrates.  (Tr. 408).  No active disease was shown.  (Tr.

408).  Plaintiff's diagnosis was pleuritic[6] pain in the chest.  (Tr. 407).  Plaintiff was

discharged in stable condition.  (Tr. 409).

Plaintiff was seen by David Giem, M.D., on December 12, 2005.  (Tr. 416-17).

Plaintiff complained of chest pain and exhibited a cough.  (Tr. 417).  Examination

revealed audible wheezing.  (Tr. 417).  Plaintiff's diagnosis remained asthma.  (Tr.

417).

Plaintiff went to the emergency room on December 18, 2005 with complaints

relating to her asthma.  (Tr. 392).  She reported a tightness sensation in her chest

that was accompanied by a cough.  (Tr. 392).  The feeling was worse when plaintiff

was lying on her back.  (Tr. 392).  Examination revealed mild wheezing in plaintiff's

lungs.  (Tr. 393).  Her upper extremities were noted as "non-tender" with normal

---

[6]Pleurisy develops from inflammation of the pleura and is characterized by a sudden onset of painful and difficult respiration.  Meriam-Webster's Online Medical Dictionary, at http://meriam-webster.com/medical/pleurisy (last viewed February 25, 2010).

range of motion. (Tr. 393). Plaintiff's diagnosis was an acute exacerbation of asthma. (Tr. 393). Her symptoms quickly improved and she was discharged less than two hours after being administered medication. (Tr. 392-93).

On December 26, 2005, plaintiff presented to Dr. Giem with complaints of hypoglycemia, asthma and a headache. (Tr. 418). It was noted that plaintiff walked a half mile up and down a hill. (Tr. 418). It was believed that medication was causing her headache. (Tr. 418). Her diagnoses were diabetes controlled through medication and asthma. (Tr. 418). On January 4, 2006, plaintiff was seen again by Dr. Giem with complaints of a headache and heartburn. (Tr. 418). Mild wheezing was noted in the lungs. (Tr. 418). Dr. Giem's impression remained asthma. (Tr. 418).

Plaintiff completed a function report on February 27, 2006. (Tr. 124-31). Plaintiff reported that she had difficulty sleeping. (Tr. 125). She also indicated that she suffers shortness of breath simply from tying her shoes. (Tr. 125). Plaintiff stated that she had no problems cooking meals and can do her own laundry. (Tr. 126). Plaintiff believed that she could walk only twenty feet without taking a break. (Tr. 129).

Plaintiff's residual functional capacity evaluation was completed on March 23, 2006. (Tr. 419-26). It was noted that plaintiff retained the capacity to occasionally lift twenty pounds and frequently lift ten pounds. (Tr. 420). Plaintiff should avoid concentrated exposure to humidity and fumes to avoid exacerbation of her asthma symptoms. (Tr. 423).

Plaintiff was seen by Nikhat Salamat, M.D., on September 19, 2006. (Tr. 431). Plaintiff stated that her asthma had been getting worse over the past five years. (Tr. 431). Plaintiff stated that she could barely walk one block. (Tr. 431). Dr. Salamat noted that plaintiff was sitting without distress. (Tr. 431). Dr. Salamat diagnosed

plaintiff with asthma, but noted that, based on plaintiff's history and examination, he did not believe that her asthma was severe. (Tr. 431). Dr. Salamat indicated, however, that he was unable to get a real feel for how the asthma was affecting plaintiff, since he did not have any pulmonary function test results to review. (Tr. 431). He noted that plaintiff's recurrent emergency room visits suggest that she has an ongoing problem, but believed that many of her symptoms might be caused by postnasal drip and nasal inflammation rather than asthma. (Tr. 432). Dr. Salamat noted that the postnasal drip may be perceived by plaintiff as complications of her asthma when, in reality, it was a separate issue. (Tr. 432). In addition to asthma, Dr. Salamat diagnosed plaintiff with rhinitis with postnasal drip and shoulder pain. (Tr. 432).

Plaintiff underwent a pulmonary function test on October 5, 2006. During the test, plaintiff walked 1,338 feet in six minutes, without stopping. (Tr. 439). Plaintiff's fatigue level at the end of test was noted as "very slight." (Tr. 439). Her oxygen saturation remained above 95% during the six minute walk. (Tr. 439, 444). The test did show evidence of an upper airway obstruction. (Tr. 429). Dr. Salamat scheduled plaintiff for a bronchoscopy, which showed evidence of a complex tracheal stenosis[7] just below the vocal cord. (Tr. 429).

Plaintiff was seen at the Lung Center at the Washington University School of Medicine on October 31, 2006. (Tr. 443). Plaintiff reported waking up at night short of breath. (Tr. 443). Plaintiff also reported having frequent sinus infections and postnasal drip. (Tr. 443). Plaintiff was not taking any medications at the time of her visit. (Tr. 443). On physical exam, plaintiff was in "no apparent distress." (Tr. 443).

---

[7]Stenosis is a stricture of any canal. Stedman's Med. Dict. 1673 (26th ed. 1995).

Plaintiff's diagnosis was complex tracheal stenosis. (Tr. 444). It was believed that the tracheal stenosis may have been a contributor to her asthma-like symptoms over the past several years. (Tr. 444).

Plaintiff underwent surgery on March 22, 2007 to correct her tracheal stenosis. (Tr. 467). Stenosis was identified beginning below plaintiff's vocal cords. (Tr. 468). The surgery was successfully completed and plaintiff was in stable condition. (Tr. 469).

On March 29, 2007, plaintiff presented for a follow up to her surgery. (Tr. 465). Dr. Bryan Meyers, the surgeon, noted "excellent healing." (Tr. 465). Minimal swelling was noted and Dr. Meyers was "quite pleased" with the outcome. (Tr. 465).

## IV. The ALJ's Decision

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since October 1, 2003, the alleged onset date.

3. The claimant has the following severe impairments: chronic obstructive pulmonary disease, asthma and right shoulder surgery.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record...the claimant has the residual functional capacity to stand and walk 2 or 8 work hours, to sit of 8 work hours, to frequently lfit and carry up to 10 pounds, to occasionally climb stairs and ramps but never ropes, ladders or scaffolds, can no more than occasionally reach overhead on the right and must avoid even moderate exposure to fumes, odors, dusts and gasses and concentrated exposure to humidity and hazardous heights.

6. The claimant cannot perform any past relevant work.

7. The claimant was born on July 19, 1964 and has been a younger individual age 18-44, throughout the period in issue.

-12-

8. The claimant has a high school education and communicates in English.

9. There is no evidence documenting that the claimant has transferable skills for sedentary work.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, through the date of this decision.

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv., 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, she is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, she is not

-13-

disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, she is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of performing any other work in the national economy. If the claimant is not, she is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

## A. Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. the ALJ's credibility findings;

2. the plaintiff's vocational factors;

3. the medical evidence;

-14-

4.      the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.      third-party corroboration of the plaintiff's impairments; and

6.      when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

## B.      Plaintiff's Allegations of Error

Plaintiff asserts that the ALJ ignored the portions of the record favorable to plaintiff and made findings based solely on those portions favorable to the Social Security Administration.  As such, plaintiff contends that the ALJ's conclusions are not supported by substantial evidence.  Plaintiff also contends that the ALJ insufficiently considered plaintiff's impairments in combination.  Plaintiff also claims that the ALJ improperly considered her daily activities and failed to give appropriate weight to her subjective complaints.  Finally, plaintiff asserts that she is unable to perform "other work" existing in the national economy.

## 1.  Residual Functional Capacity and Credibility Determinations

Although plaintiff does not specifically argue that the ALJ's assessment of her residual functional capacity (RFC) was erroneous, several of plaintiff's arguments imply that the RFC was miscalculated.

It is the duty of the ALJ to determine plaintiff's RFC after considering all relevant evidence. See Lauer v. Apfel, 245 F.3d 700, 703-704 (8th Cir. 2001). However, "[a] claimant's residual functional capacity is a medical question." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Thus, while the ALJ must consider all relevant evidence, at least "some medical evidence" must support the residual functional conclusions of the ALJ. See Lauer, 245 F.3d at 704.

The ALJ found that plaintiff retained the residual functional capacity to stand and walk 2 of 8 work hours, to sit 6 of 8 work hours, to frequently lift and carry up to 10 pounds, to occasionally climb stairs and ramps but never ropes, ladders or scaffolds, and to only occasionally reach overhead on her right. In addition, the ALJ found that plaintiff must avoid even moderate exposure to fumes, odors, dusts and gases. (Tr. 27). With this RFC, the ALJ concluded that plaintiff could not perform her past relevant work, but that she could perform other work existing in significant numbers in the national economy. (Tr. 31-32). Accordingly, the ALJ found that plaintiff was not disabled. (Tr. 32).

Plaintiff's first argument is that, in making these findings, the ALJ failed to consider medical evidence supporting plaintiff's allegations of disability. Plaintiff points out that she testified regarding intense pain and her difficulty walking long distances. Plaintiff contends that the RFC determination does not take into account this evidence.

Upon review of the entire record, the Court finds that the ALJ's RFC determination is supported by substantial evidence. Plaintiff's contention that the ALJ ignored evidence favorable to plaintiff is without merit. The ALJ noted in its decision that plaintiff claimed she had difficulty walking even short distances. The ALJ also noted plaintiff's complaints of pain. The ALJ recognized that, if all of plaintiff's allegations were fully credible, she would not be able to work. (Tr. 29). Thus, in

making the RFC determination, the ALJ did not ignore plaintiff's allegations.  Instead, the ALJ found that the allegations were not entirely credible.

"[W]hen assessing whether a claimant's subjective complaints are credible, the ALJ must consider all of the evidence, including claimant's work history and observations regarding: (1) claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) the dosage, effectiveness and side effects of medication; (4) any precipitating and aggravating factors; and (5) claimant's functional restrictions." Polaski v. Heckler, 739 F.2d 1320, 1321 (8th Cir. 1984).  The ALJ is not required to discuss each Polaski consideration, so long as its considerations were acknowledged and examined prior to discounting the claimant's subjective complaints.  See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).

The ALJ applied the Polaski considerations and found that plaintiff's allegations of disabling pain were not fully credible.  The Court finds that substantial medical evidence supports this determination.  First, the medical records show that plaintiff could walk far more than she would admit.  For instance, in September 2006 plaintiff stated that she could barely walk a half block without being completely winded.  (Tr. 431).  However, during her pulmonary function test in October 2006---just one month later---plaintiff walked 1,338 feet (over a quarter of a mile) without stopping.  (Tr. 439).  After doing so, her fatigue level was noted as "very mild."  (Tr. 439).  Plaintiff exhibited only "moderate" shortness of breath following the test.  (Tr. 439).  Further, treatment notes from Dr. Giem, dated December 2005, indicate that plaintiff was able to walk a half mile up and down a hill.  (Tr. 418).  This evidence contradicts plaintiff's allegations that she has disabling shortness of breath upon walking only a half block.  Instead, the evidence supports the ALJ's RFC determination that plaintiff can stand and walk for two out of every eight hours of work.

The ALJ also properly considered plaintiff's activities of daily living under Polaski. Plaintiff testified that she required a lot of assistance from family members in taking care of her household. However, in her function report, she indicated that she took care of her two younger children and performed some housekeeping tasks alone while her older child was at school. Plaintiff admitted that she retained the ability to independently go shopping, provide child care and prepare meals. While the Court does not view these activities of daily living alone as being fully inconsistent with plaintiff's allegations, they can appropriately be considered, with other objective evidence, as contradicting her claim that she is fully disabled.

The objective medical evidence in the record supports the ALJ's determination that plaintiff was not disabled. While plaintiff claims that her medication has not controlled her asthma symptoms, the record demonstrates that, when plaintiff took her medicine as directed, plaintiff's asthma symptoms would improve. Treatment notes dated June 28, 2004 indicate that her asthma problems had "resolved with medication". (Tr. 215). During many of plaintiff's visits to the emergency room, plaintiff's symptoms quickly resolved upon the administration of medication. (Tr. 316, 334, 404, 415). See Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2002)("If an impairment can be controlled by treatment or medication, it cannot be considered disabling"). On several occasions, plaintiff admitted that she was not taking her asthma medication. (Tr. 175, 363, 406, 443). Indeed, plaintiff acknowledged that her asthma symptoms worsened when she did not take her medication. (Tr. 175).

Additionally, on September 19, 2006, Dr. Salamat examined plaintiff and opined that her asthma was not severe. (Tr. 431-32). Plaintiff's asthma symptoms, including chest pain and wheezing, were described as "mild" on multiple occasions. (Tr. 355, 393, 406, 418). Dr. Salamat believed that many of plaintiff's asthma-like symptoms

were actually caused by her tracheal stenosis, which was corrected through surgery in March 2007.

With regard to plaintiff's right shoulder pain, the records similarly suggest that the impairment is not as severe as alleged by plaintiff. While the pain was regularly described as severe during plaintiff's medical visits immediately after injuring her shoulder, the complaints dissipated as time passed. Indeed, right shoulder pain or arm pain was not even mentioned in the majority of the medical notes beginning around January 2004---just three months after plaintiff injured her shoulder at work. These complaints did not appear in the medical records again until October 2005, when plaintiff was being examined for the Missouri Disability Determination Division. (Tr. 383). However, even after October 2005, the treatment notes fail to show consistent complaints of disabling pain in plaintiff's right upper extremity. The medical records support the ALJ's determination that plaintiff was capable of frequently lifting ten pounds and occasionally reaching overhead on the right side.

Based on all of this evidence, the Court finds that the ALJ's residual functional capacity assessment was supported by substantial evidence. The ALJ properly weighed the credibility of plaintiff's subjective complaints. Plaintiff's claims on these grounds are denied.

### 2. Plaintiff's Combined Impairments

Plaintiff contends that the ALJ did not consider the combined effect of her impairments. Contrary to plaintiff's assertion, the ALJ did consider plaintiff's impairments in combination, but found that they did not medically equal one of the listed impairments. (Tr. 27). It is true that the ALJ only discussed plaintiff's impairments individually. However, nothing more is required. See Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992)(finding that, so long as the ALJ has

-19-

considered each of plaintiff's impairments individually, there is no requirement for an elaborate articulation of the ALJ's thought processes in regard to whether those impairments limit plaintiff's ability to work when viewed in combination). Here, the ALJ considered plaintiff's alleged impairments individually and found that they did not limit her ability to work individually, or in combination. Such a finding is sufficient and is supported by substantial evidence on the record as a whole.

### 3. Other Work in the National Economy

Plaintiff's final claim is that the ALJ erred in finding that plaintiff can perform "other work" existing in the national economy. Plaintiff contends, without legal support, that the ALJ cannot "deny a claim because of opportunities for work that are merely conceivable and not reasonably possible." Plaintiff claims that "[i]n the real world, her opportunities for getting a light cashier position in this regional area or in the state would be very limited."

Plaintiff's position is not supported by the law. The Commissioner is only required to show that the jobs plaintiff is capable of performing exist in significant numbers in the national economy. See 20 C.F.R. § 404.1566. It does not matter whether such work exists in the immediate area in which plaintiff lives, or whether plaintiff would be hired if she applied. Id.

At the hearing, the vocational expert testified that plaintiff could perform other work as a sedentary assembler or as a cashier, and that such work existed in significant numbers in the national economy. (Tr. 56-60). It was proper for the ALJ to rely on this testimony in finding that plaintiff was capable of performing other work. Because substantial evidence supports the finding that plaintiff can perform other work that exists in significant numbers in the national economy, plaintiff is not disabled

within the meaning of the Social Security Act and Regulations.  <u>See</u> 20 CFR 404.1520(f) and 416.920(f).

## VI. <u>Conclusion</u>

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.  Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her complaint [#1] and her brief in support of complaint [#16] is **denied**.

A separate judgment in accordance with this order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT COURT

Dated this 16th day of March, 2010.